SHEPHERD & SHEPHERD v DEITZ

OPINION OF THE COURT

1. APPEAL AND ERROR—FINDINGS OF FACT—CONCLUSIONS OF LAW—DE
NOVO REVIEW.

   The findings of fact and conclusions of law of a trial court will
   not be reversed where upon *de novo* review it is found that the
   record supports the findings of fact and that the conclusions of
   law are in accord with the findings of fact, and where the Court
   of Appeals would not have decided differently.

DISSENT BY O'HARA, J.

2. SPECIFIC PERFORMANCE—LEASE—PURCHASE AND SALE AGREEMENT.

   *Specific performance of a lease executed after a valid purchase
   and sale agreement for the premises was consummated should
   not be judicially approved.*

Appeal from Newaygo, Charles A. Wickens, J.
Submitted Division 3 December 4, 1973, at Detroit.
(Docket No. 16398.) Decided January 16, 1974.
Leave to appeal granted, Court of Appeals re-
versed for reasons stated in dissent, and remanded
for entry of judgment of no cause of action, 392
Mich 754.

Complaint by Shepherd & Shepherd against Cal
Deitz, Cal Deitz Realty, Benny Brock, and Orrin
Bush for specific performance of a lease. Judgment
for plaintiff. Defendant appeals. Affirmed.

REFERENCES FOR POINTS IN HEADNOTES

[1] 5 Am Jur 2d, Appeal and Error § 820 *et seq.*·
   Advantage which the original trier of facts enjoyed over reviewing
   court from opportunity of seeing and hearing witnesses, 111 ALR
   742.

[2] 55 Am Jur, Vendor and Purchaser § 313.
   49 Am Jur 2d, Landlord and Tenant §§ 11, 1004.
   Construction of provision for termination of lease in event of sale of
   property, 163 ALR 1019.

*McCroskey, Libner, VanLeuven, Kortering,
Cochrane & Brock, P. C.* for plaintiff.

*Landman, Hathaway, Latimer, Clink & Robb* (by
*William F. McNally),* for defendants.

Before: R. B. BURNS, P. J., and DANHOF and
O'HARA,* JJ.

R. B. BURNS, P. J. This is an equity action deal-
ing with the validity of a lease.

E. E. Henning and Henrietta Osthaus were ap-
pointed as attorneys in fact with authority to
manage and dispose of the property of Dr. and
Mrs. Moore. After Dr. Moore's death the property
was put up for sale. A written offer to purchase,
dated March 25, 1970, was submitted to Henning
by defendant Deitz in the amount of $40,000.

Plaintiff law firm, Shepherd & Shepherd, were
long-time tenants of the building under a lease.
Henning and Henrietta Osthaus agreed to give
plaintiffs first chance to purchase. Plaintiffs indi-
cated they would give up their first purchase
option for a long-term protective lease covering
their offices in the building.

Plaintiffs and Henning executed a ten-year lease
prior to Henning signing the purchase agreement
with defendants, although Henrietta Osthaus did
not sign the lease until three days later.

The trial court granted specific performance of
the lease to plaintiffs. Defendants appeal.

Defendants contend: (1) the purchase agreement
was executed first giving them control of the prop-
erty; (2) the co-attorneys did not act jointly accord-
ing to the power granted in executing the lease; (3)
they had no knowledge of the existence of the

* Former Supreme Court Justice, sitting on the Court of Appeals by
assignment pursuant to Const 1963, art 6, § 23 as amended in 1968.

lease upon receipt of the executed purchase agreement from Henning which would estop them from denying the lease.

The court made the following findings:

1. The lease was executed prior to the purchase agreement.

2. Henning had the responsibility for decision making on the handling of property and co-attorney in fact, Osthaus, did the bookkeeping and leg work. This had been their course of dealing in the past. The late signing by Osthaus did not effect the validity of the lease because the signing related back and ratified the act of her co-attorney making it a joint act.

3. The court found, as a fact, that defendant and co-partner Brock had knowledge of the executed lease agreement which was imputable to co-purchaser Deitz upon the agency theory that knowledge of one partner is knowledge to all.

As a result of our careful and *de novo* review, we find the record supports these findings of fact. We also are convinced that the court's conclusions of law are in accord with its fact finding. We would not have decided differently.

Affirmed. Costs to plaintiffs.

DANHOF, J., concurred.

O'HARA, J. *(dissenting)*. I am unable to agree with my colleagues, and thus I must respectfully dissent.

To understand my position it is necessary that I set forth what I consider the controlling provision of the instrument which vested control of the property in Mr. Henning and Miss Osthaus.

"It is agreed between the parties that the said managers shall act in the capacities designated following:

\* \* \*

"(3) E. E. Henning and Henrietta Osthaus, *jointly:*
The disposition of real estate by conveyance, or sale, as
in their best judgment the same is advisable, or any
parcel of realty, and the reinvestment of the proceeds
thereof; also the disposition, by gift, of the realty south
of the alleyway, in Block 6, of the Village of Newaygo,
to the Village of Newaygo, for parking lot purposes,
under such circumstances and conditions as the said
E. E. Henning and Henrietta Osthaus shall deem advis-
able." (Emphasis supplied.)

Both Mr. Henning and Miss Osthaus signed a
purchase agreement which had also been fully
executed by the offerors. On its face it shows
execution by the offerors on March 25, 1970. The
terms were $40,000 cash, with an "earnest money"
deposit of $500.

The date line across from the signatures of the
attorneys-in-fact is blank.

Under the testimony of both Mr. Henning and
Miss Osthaus they candidly admit the purchase
agreement was fully executed before the lease was
fully executed. The lease had not yet been exe-
cuted by Miss Osthaus. I quote the transcript:

*"Q. [Direct examination by defendant's counsel]:* Now,
when was the first time you learned about the proposed
offer by Mr. Deitz to buy the property?

*"A. [Miss Osthaus]:* I went into the, into Mr. Hen-
ning's office one day and he handed me this purchase
agreement to read. And, I read it and I said, 'Well,
Dutch, [Mr. Henning] let's take it. It's cash, and I don't
know when we will get another offer.'

*"Q.* And, did you, in any manner, indicate that the
property should be saved for Mr. Shepherd?

*"A.* No, only that Dutch told me he would like to give
Mr. Shepherd the first chance to purchase the building.

*"Q.* Now, did you sign the agreement on that day that
you first saw it, the purchase agreement?

*"A.* No, because we had, according to the agreement,

until April first, and I, naturally, thought it would expire at noon on April first. So, he was going to see if Mr. Shepherd, and let him have first chance.

"*Q.* Did you subsequently sign the purchase agreement?

"*A.* I did, later on.

"*Q.* And, did—were you subsequently asked to sign a lease running between yourself and Henning, on the one hand, and Mr. Shepherd on the other hand?

"*A. I was, a few days after the purchase agreement.* (Emphasis supplied.)

\*   \*   \*

"*Q.* At the time that you had this discussion with Mr. Henning, did you know, well, strike that—at the time you had ·a discussion with Mr. Henning, and he asked you to sign this lease, did you know that Mr. Deitz had already received the signed purchase agreement? And, had bought the building?

"*A.* Yes.

*Mr. McNally:* No further questions."

\*   \*   \*

*[On direct examination Mr. Henning testified:]*

"*A. [Mr. Henning]:* I called Cal Deitz at about a quarter to twelve on the day I thought his offer expired and told him Russ had agreed to a fifteen-year lease and Cal told me that still wasn't good enough and I then went back to Shepherd. I didn't sign the purchase agreement right then. I went back to Russ and told him Cal Deitz would not accept the fifteen-year lease and it would have to be less. Then Russ did agree, for the third time, to go ten years, five plus five. And, I had assumed this would be acceptable to Cal Deitz and then I signed the lease in Russ's office and then went back to Cal Deitz's office and signed the purchase agreement, after it had been reduced to five plus five.

"*Q.* At that time, had the purchase agreement been signed by Henrietta Osthaus?

"*A.* Yes.

"*Q.* Had the lease been signed?

"*A.* No.

"*Q.* When did she sign it?

"*A.* She must have signed it two or three days later."

I do not want to be misunderstood. I do not even remotely suggest any collusion or ill-intentioned motive on the part of Mr. Henning, Miss Osthaus, or Mr. Shepherd. Each I am sure acted honorably.

But I must record in support of my position that the purchasers made their position abundantly clear to Miss Osthaus before she signed the lease.

"*Q. [Cross-examination by plaintiff's counsel]:* And, the first time, I take it, that you knew that the deal had been completed, as at least so far as the sale of the Moore property, was when Mr. Deitz called you on the phone?

"*A. [Miss Osthaus]:* That's right.

"*Q.* At that time, I take it, you were, first of all, glad that it had been completed?

"*A.* Yes.

"*Q.* And, you were then told not to sign any lease?

"*A.* That's right.

"*Q.* So, you knew what he was talking about when he said that about leases?

"*A.* That's right."

I have read the record with extreme care and I think Mr. Henning simply erroneously concluded that the Shepherd lease terms would be acceptable to the purchaser.

I think we would do violence to a great deal of settled law to give after-the-fact effect to the plaintiff's lease.

Plaintiffs' counsel urges in his brief that:

"As stated in the opening statement and in the closing argument at the trial by this writer, this is a transaction carried out in typical Newaygo fashion. It was based in part upon oral promises and reliance thereon. It was based on trust and for the most part many years of mutual understanding between friends."

The Newaygo fashion may very well be the same as the Menominee fashion where I practiced law for a quarter of a century before going to the bench. They are both small towns in the north country. I know exactly what plaintiffs' counsel means.

Whatever my personal feeling is I cannot judicially approve the grant of specific performance of a lease executed after a valid purchase and sale agreement was consummated.

I would reverse and direct the entry of a judgment denying the relief sought and award costs to the defendants-appellants.